And we'll call the next matter, I hope I'm getting this right, Marquardt-Stoneking, did I get that right? Good morning, Your Honors. Opposing counsel. May it please the Court. This case is about a claimant's testimony regarding the frequency and intensity of her migraine headaches. This is, of course, a Social Security claim. The judge found that the claimant does have a severe impairment of migraines. Appellant testified that she has an average of two migraines per week. She has access to an abortive medication, sumatriptan. So when she has a migraine, she takes that medication, and about an hour and a half later the headache will subside, leaving behind some drowsiness and stomach ache. Of course, because of that, for that hour and a half until the medication kicks in, there's not much she can do other than lie down and wait for the headache to go away. So her medications are effective to a point, but by their very nature, they can't be taken until the migraine happens. Now, the ALJ did discuss her migraine testimony, but in essence, the judge agreed with everything she said. The ALJ explicitly found that appellant has one to two migraines per week and that she's treated her migraines consistently with her prescription medication. Is that Imitrex, by the way, is that what she's using? I have it down as sumatriptan. I don't know if that's the same medication. I'm not as familiar with those medications as I'd like to be. The ALJ noted that appellant's migraines are not intractable. An intractable migraine is one, by definition, that lasts 72 hours. So her testimony didn't say that they are intractable. There's no contradiction there. The ALJ noted that they respond to her abortive medication. Again, that's exactly what she testified to. And then the ALJ stated that her migraine headaches support limiting her to jobs where breaks are available every two hours. And that's really the point of contention here because there's just no path from a migraine that lasts an hour and a half to a break every two hours. There's no explanation for why a break every two hours would accommodate that problem. I'm puzzled. Your position now is that the ALJ didn't take this into account? Our position ultimately is that the RFC does not reflect this testimony and that the ALJ did not give adequate reasons to reject that testimony. So he's got to do either one or the other. Did you raise that in your opening brief? I believe we did, yes. The testimony about having to lie down for an hour and a half? Well, we can check that. I'm sorry? We can check that. Of course. Ultimately, bottom line, do we have to say that that would be a disability? The court does not have to find that that would be disabling. The court could simply find that the ALJ didn't do enough to address it. And then the question would be whether there is enough in the record to establish that that would be disabling. If there definitely is, the court could remand for a directed payment. If it's unclear, the court could remand for further proceedings to fully address that testimony. Your theory, though, is that that symptom was not folded into framing the question to the vocational expert? Essentially, yes. There was a question to the vocational expert regarding time off task in a professional capacity. We do believe that an hour and a half a few times a week is going to involve too much time off task. But ultimately, whether that's enough as it is, is a secondary question. Did she testify that she always gets these headaches when she's working? Well, she testified that she's still getting those headaches even though she's not working. So she obviously doesn't just get them while working. I don't believe she testified as to what time of day they occur. So there might be some question there, perhaps. One of the things raised in the briefs was the question of whether the judge justifiably relied on the conservative treatment for her migraines as a reason to reject her testimony. In the first place, the judge actually didn't raise that point. He did say that her medications are effective, but that's consistent with her testimony. He did not frame the treatment as conservative. But even if we assume that that's sort of baked into his point, the case law on conservative treatment has this sort of underpinning notion that conservative treatment is inconsistent with the allegations that are being made. And I don't think that can be reached here. The only more aggressive treatment available other than these abortive medications would be Botox. And in order to qualify for Botox, you have to have 15 migraine days per month. Per her allegations, Ms. Marquardt-Stoneking has eight to nine migraines per month, about two per week. So that wouldn't qualify her for Botox. So she's doing everything she can. If there's nothing further, I'll hold my clock for rebuttal. Very well. In fact, in rebuttal, if you could just confirm Judge Schroeder's question about where in the brief, that would be great. Good morning, Your Honors. Katherine Watson for the commissioner. The ALJ here on C.A.R. 27 specifically referenced Marquardt-Stoneking's allegations of migraines. The ALJ specifically discussed how Marquardt-Stoneking alleged that it took her about an hour, an hour to an hour and a half, to respond to migraine medication. And as my counsel noted, which is correct, she's effectively alleging that during that time, she was disabled. The ALJ disagreed. The ALJ specifically said in C.A.R. 27 that Marquardt-Stoneking's allegations regarding the severity of her impairments, which would include migraine headaches, are not fully reliable. And then on C.A.R. 28, the ALJ provided specific reasons as to why, that under this court's precedent, are sufficient to discount her testimony of debilitating migraine headaches. In other words, her testimony that she's effectively bedridden for about an hour, an hour and a half, until her medication aborts her headache. So first, the ALJ noted that Marquardt-Stoneking treated her migraines consistently with a prescription medication. Now I turn this court's attention to SMART. In that case, this court held that the ALJ there documented evidence of conservative treatment. And in that case, it was ongoing pain medications as well as other measures following initial surgery to treat, in that case, it was allegations of debilitating neck pain. Here, similarly, the ALJ documented evidence of conservative treatment. In this case, it was a single prescription medication. Now the reason why this treatment is conservative, and I would note the ALJ didn't use the word conservative, but as in SMART, the ALJ documented evidence of conservative treatment. And this court has noted in various other contexts, magic words are not required. We have documented evidence of a conservative treatment here that the ALJ specifically relied on to discount her testimony. The reason why this treatment is conservative is because what the ALJ said, which is that she treated her migraines consistently with this medication. What does that mean? It means she never asked her doctors for a higher dosage. It means she never said, you know, it takes me an hour and a half, I'm bedridden, let me get another medication to relieve that pain for my migraines. It means she never switched medications. Instead, she treated her migraines consistently with this single medication, without ever changing the dosage or the type of medication. I note she did so not only throughout the period at issue, but also even before the date that she alleged debilitating impairments. The ALJ also noted that this treatment... This medication, that if it's taken on a regular basis, helps to prevent the frequency of migraines. There's some suggestion in the record that maybe for financial reasons, she wasn't able to consistently afford the medication. And so, therefore, she wasn't necessarily taking it proactively. My understanding was that this was an abortive medication. I'm not aware of any evidence in the record that she was unable to get more medications. I note that her primary allegations, and what the medical record primarily focuses on, was her knee pain. She also alleged debilitating back pain. And she had medications for those impairments as well. And I don't believe there's any evidence in the record that she was unable to obtain medications. I'd also note she did have unfortunate circumstances. She was effectively homeless, living in a forest for a period of time. And while those circumstances are certainly unfortunate, she specifically testified, and this is on CAR 27, that she can drive to... She said, yes, I can drive to a doctor when I need to. She said her car, on CAR 62, she said her car was located 10 feet away from her. So there's no evidence that I'm aware of in the record that for any reason, she was unable to obtain her treatment. But what the record does say is that the treatment that she had was conservative, and that she never changed her treatment for her migraine headaches. VLJ also noted that treatment notes indicate that her migraine responded to this medication. Now, I note that the treatment notes are very sparse when it comes to her migraine headaches. So VLJ is looking at what the treatment record says. VLJ primarily focused his decision on what the treatment record focused on, which was her debilitating knee pain. In fact, on CAR 1526 and CAR 1531, when she informed her treatment providers that she was applying for disability benefits, she said she was doing so on the basis of her knee pain, not her migraines. So treatment notes effectively simply state in somewhat rudimentary terms that this was effective migraines. They treat migraines largely in passing reference. What they do indicate is that the abortive medication worked. And VLJ also noted that in September of 2021, Margaret Stone King indicated that she had been out of her medication for a while. And as I noted elsewhere, there doesn't seem to be any reason for why she couldn't have gone in and gotten this medication. And I look to what the underlying medical record said here. So we have in November 2020 and in January 2021, 60 days later, she's requesting refills. We have then a complete absence of treatment from January 2021 to September 2021, when she again goes in to request refills. And note she's been out of her migraine medication for a while. That's eight months with no treatment. She's alleging debilitating migraine. She said that she did not get those migraines until 2020. So we have an under two-year period where she's alleging debilitating migraines. And we have eight months in that period where she has no treatment, and within that eight months, say approximately six months, about a quarter of the period at issue, when one can infer she had no migraine medication. I turn this Court's attention to Macri v. Chater. In that case, this Court held that the ALJ reasonably discounted the claimant's allegations of debilitating pain when the claimant had not been taking pain medication for a portion of the relevant period. In that case, that portion was since October 1986, and the relevant period or the period at issue in that case ended in December of 1986. That's a two-month period. Here, if anything, we have a longer period. And the ALJ specifically relied on that as well when noting that she had indicated in September 2021 that she'd been out of medication for a while. So the fact that she seemed to willingly go without any sort of treatment, any kind of pain medication, even abortive medication, when she's alleging that she's effectively bedridden with migraine headaches, was another reason for the ALJ to discount that testimony. I'd also note that on CAR 29, the ALJ considered other evidence when assessing the RFZ. So the ALJ considered the only assessments of her functioning during the period at issue. There were no treatment providers that offered opinions. The state agency medical consultants considered her migraines and found that she could perform a range of medium work. And the ALJ found those assessments largely persuasive. In fact, the ALJ provided more limitations in the RFZ to account for her knee impairment. The ALJ also considered third-party function reports. This was from her roommate as well as her father. These third-party function reports were issued in 2020. This was after she's alleging debilitating migraines. Yet neither her roommate nor her father, who saw her on a regular basis, even mentioned migraines in their function reports. The only impairment they really discussed was the main impairment she was alleging, the primary impairment focused in her treatment notes, which was her knee pain. And as the ALJ noted, these third parties discussed how she could perform various activities. In fact, their treatment notes indicate, for example, Mr. Zechariah indicates she's reading, she's sewing, she's crocheting on a daily basis. They're not indicating that on days when she had migraines, she was bedridden. There's no mention of that. So the ALJ considered all the evidence when assessing the RFZ and reasonably concluded that she could perform work consistent with the state agency consultant's findings, which that she could perform a range of medium work even with her migraine headaches. How old is she? She was 36 on her application date, which was in September 10, 2019. It's kind of a sad case. Is it really fair to hold it against her for not seeking treatment when she was homeless and living in rather dire circumstances? Certainly it is a sad case, and she does have unfortunate circumstances, so I certainly understand the concern there. But I do believe that under our regulations, the question is, did she have a good reason not to seek treatment? I don't believe homelessness in itself is a good reason unless it prevents access. And here she specifically testified that she had access. So her own testimony refutes that. The ALJ did ask her about that. The ALJ asked her, you know, where you're living, are you able to get to treatment? She said yes on car 47. Yes, I can drive to a doctor when needed. I believe she was asked more. This was by opposing counsel and questioning, you know, how far away is your car? It's 10 feet away. So there's no evidence in the record that she didn't have access. Certainly her circumstances are unfortunate, but they did not prevent access based on her own testimony. All right, thank you, counsel. Thank you. Thank you again, Your Honors. A few things to cover. First of all, as to your point, Your Honor, the issue was raised, I believe, in the opening brief at page 9. We noted that the testimony was not directly addressed, and at pages 11 to 12 discussed the inadequacy of the RFC findings. So even if not expressly raised in that way, I think it's baked into the brief. So first of all, I wanted to address this period of not treatment. I'll be candid. I don't know the details of how an appellant gets her medications. I know my medications come to me by mail. I refill them every three months. I see my doctor about every year. So the fact that Ms. Marquardt Stoneking may have gone eight months between seeing her doctor doesn't mean she was without medication for that entire eight months. It might be five months. It might be two months. The record is silent as to exactly how long she had been without her medications. All she said to her doctor was, I've been out for a while. She might have run out maybe a couple weeks ago. We don't know. There's no reason to assume it was that entire eight months without medication, and even if there was, there's nothing in the record to say how bad her migraines were during that time. At worst, we could assume that after that eight months, she's had her medication consistently and her testimony still is what it is. As to the conservative treatment case law, my colleague raised Smart Vickie Jakazi. In that case, the claimant had alleged a broken neck and crushed vertebrae, had surgery to stabilize her neck immediately after the injury, and other than that, received only pain medication and physical therapy. I think that's a very different animal from a chronic illness like a migraine situation where there's really nothing you can do other than throw pills at it. The underpinnings of the Smart case are Para V. Astru, 481 F. 3rd, 742 from 2007. In that case, the claimant had alleged bursitis-related knee pain, but there were numerous VA exams showing normal knee function, and he was treating it with over-the-counter medication. Again, a very different situation. So opposing counsel raised the issue that the state agency consultants considered Ms. Marquardt-Stoneking's migraines and did not offer any greater limitation. I don't think that's relevant. A claimant's testimony as to their symptoms is evidence that the judge has to consider, and the state agency consultants did not have the benefit of that testimony. Lastly, there was the issue of her activities of daily living. This is directly addressed in Ferguson v. O'Malley from a couple years ago. A person can both do these things while they are headache-free and not be able to do them while they have a headache. Unless they're alleging that they have headaches 24 hours a day, 7 days a week, there's no inconsistency there. Here she's alleging about 3 hours out of the week that she's down with a headache, assuming 2 headaches per week, an hour and a half before her abortive medications kick in. That would still leave her 160-plus hours a week, minus however much time she spends sleeping, that she could do those activities of daily living. There's no reason to think that that's inconsistent. Thank you. Thank you, counsel. Thank you to both of you for your briefing and argument in this case. This matter is submitted.
judges: SCHROEDER, TALLMAN, OWENS